**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **MATTHEW W. PHILP,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:15-cv-00913** |
| | ) | **Judge Sharp / Frensley** |
| **DAVID ELOLA, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## REPORT AND RECOMMENDATION

### I.  Introduction and Background

This matter is before the Court upon Defendants' Motion for Summary Judgment.

Docket No. 38.  Along with their Motion, Defendants have contemporaneously filed a supporting

Memorandum of Law (Docket No. 39) and a Statement of Undisputed Material Facts (Docket

No. 40), as well as the Affidavits of Rondia Felts with Exhibits ("Felts Aff.")(Docket No. 41-1),

David Elola ("Elola Aff.")(Docket No. 41-2), Joshua Miller ("Miller Aff.")(Docket No. 41-3),

and Derrick Webster ("Webster Aff.")(Docket No. 41-4), and excerpts from the Deposition of

Matthew Philp ("Plaintiff's Dep.")(Docket No. 41-5).

Plaintiff has not responded to Defendants' Motion or Statement of Undisputed Material

Facts, nor has Plaintiff filed his own Statement of Undisputed Material Facts.

Plaintiff filed this pro se, in forma pauperis action pursuant to 42 U.S.C. § 1983, alleging

that Defendants violated his Eighth amendment rights.  Docket No. 1.  Specifically, Plaintiff

avers that Defendant Elola "aggressively approached" him, "pointed his finger" in Plaintiff's

face, yelled at him to return to his bunk or be taken to the "hole," and instructed Plaintiff to "pack

your shit." *Id.* Plaintiff asserts that he "stood in temporary shock," and that, before he had time

to respond to Defendant Elola's "demands," Defendant Elola again ordered Plaintiff to "pack

your shit." *Id.* Plaintiff avers that he replied "But I did nothing wrong," in response to which

Defendant Elola grabbed him and slammed him into the wall. *Id.* Plaintiff asserts that

Defendants Miller and Webster then "rush[ed] in and start[ed] attacking" him, "repeatedly

slamming him into the wall twisting his arms behind him, shoving his head toward the ground

etc." *Id.* Plaintiff avers that when Defendant Miller turned his attention toward another inmate,

Plaintiff was able to "escape the grasp of the two remaining officers (Webster, Sgt. Elola)." *Id.*

Plaintiff asserts that, "once free [he] retreated under the stairs towards the bathroom." *Id.*

Plaintiff avers that Defendant Miller followed him to the bathroom and sprayed him with pepper

spray. *Id.* Plaintiff maintains that Defendants then left, but returned approximately fifteen

minutes later to try to "talk to him in a peaceful manner." *Id.*

     Plaintiff sues Defendants in their official capacity, arguing that "they lack the proper

training needed to safely restrain an inmate without risk of causing serious injury or the use of

excessive force." *Id.*[1] Plaintiff further argues that Defendants have "demonstrated their inability

to resolve issues without the use of threats and violence against non-threatening victims." *Id.*

Plaintiff contends that he "constantly" has "bad dreams about the whole situation," and suffers

from "the re-injury to" his shoulder; he seeks "[t]o be compensated for living in fear of officers

daily." *Id.*

---

[1] Plaintiff indicates in his Verified Complaint that he sues Defendants solely in their official capacities, and he reiterated such during his deposition. *See* Docket Nos. 1, 41-5. During this Court's frivolity review, however, the Court found that Plaintiff additionally stated individual capacity claims against Defendants. Docket No. 3. Accordingly, the undersigned will analyze Plaintiff's claims against Defendants in both their individual and official capacities.

Defendants filed the instant Motion and supporting materials arguing that Plaintiff's Eighth Amendment claims should be dismissed because they do not rise to the level of a constitutional violation, and because they are entitled to qualified immunity. Docket Nos. 39 - 41-5. With regard to Plaintiff's individual capacity claims against them, Defendants argue that: 1) Plaintiff does not have a constitutional right to be spoken to in a manner that is free of abrasive tones and harsh language; 2) "[v]erbal harassment and insulting remarks, while unpleasant and unprofessional, do not constitute cruel and unusual punishment"; and 3) tone, language, and hand gestures simply do not violate any constitutional or federally protected right. Docket No. 39, *citing Johnson v. Unknown Dellatifa*, 357 F.3d, 545-46 (6th Cir. 2004).

Defendants further argue that their use of force against Plaintiff was not excessive because: 1) they used force following Plaintiff's repeated failure to comply with their orders; 2) they are not required to wait and see if an inmate is going to eventually obey an order before using force against the inmate to gain compliance; 3) they have a legitimate interest in having inmates obey orders; and 4) Plaintiff resisted their attempt to apply handcuffs by attempting to pull away in a combative manner and physically struggling with them. *Id.*, *citing Jennings v. Peiffer*, 110 Fed. Appx. 643, 645 (6th Cir. 2004); *Jennings v. Mitchell*, 93 Fed. Appx. 723, 725 (6th Cir. 2004); *Caldwell v. Moore*, 986 F.2d 595, 601 (6th Cir. 1992). Defendants contend that, had Plaintiff either complied with their orders or willfully submitted to being handcuffed, their use of force would have been entirely avoided. *Id.* Defendants additionally maintain that: 1) the "soft hand control" utilized is a permitted means by which Dickson County Correctional Officers can attempt to gain an inmate's compliance; 2) the amount of force used was minimal and did not violate contemporary standards of decency; 3) they applied force in a good faith effort to

restore discipline; 4) the use of force was necessitated by Plaintiff's refusal of three direct orders and physical resistance to being handcuffed; and 5) reasonable officers in their position would recognize the need to use physical force to gain control against an inmate that had refused to comply with multiple orders and had physically resisted an officer's previous attempt to apply handcuffs and would recognize the need to assist fellow officers who were grappling with an inmate actively resisting being handcuffed.  *Id.*  Defendants also note that, following the incident, the Dickson County Jail's ("Jail") medical staff x-rayed Plaintiff's shoulder, and Plaintiff admits that no one told him that there was any new damage to his shoulder or that his shoulder was any worse than it had been before.[2]  *Id., citing* Felts Aff., ¶ 20; Plaintiff's Dep., p. 62:25 - 63:7, 64:4-12.  Defendants also note that Plaintiff did not suffer a severe physical injury, and argue that this evidences the fact that they did not act maliciously or sadistically.  *Id.*

As to Defendant Miller's use of a chemical agent against Plaintiff, Defendants argue that the use of a chemical agent against Plaintiff was likewise done in a good faith effort to restore discipline and was not done either maliciously or sadistically to cause Plaintiff harm.  *Id.* Defendants maintain that the use of a chemical agent was necessary given: 1) Plaintiff's repeated refusal to obey orders; 2) Plaintiff's resistance to being handcuffed; 3) the prior ineffectiveness of the lessor forms of force; and 4) Defendant Miller's belief that prompt resolution to the incident was required because the approaching agitated inmates in the Pod represented a substantial threat to the officers' safety.  *Id.*  Defendants note that Plaintiff was allowed to decontaminate to lessen the effect of the chemical agent.  *Id.*, *citing* Elola Aff., ¶ 25.  Defendants assert that the use of a

---

[2] Prior to this incident, Plaintiff had torn ligaments in his shoulder and had had them surgically repaired.  Plaintiff's Dep. at 61:4-20.  Plaintiff's injury and the subsequent surgery caused arthritis to form in Plaintiff's shoulder.  *Id.*

chemical agent on an inmate is an incremental escalation of force and not the type of force that violates contemporary standards of decency, and one that a reasonable officer in their position would recognize was an appropriate use of force to gain an inmate's compliance. *Id.* Defendants additionally contend that the extenuating circumstance posed by the agitated inmates aggressively approaching the officers makes the use of a chemical agent even more objectively reasonable. *Id.*

Defendants next argue that they are entitled to qualified immunity because their use of force was reasonable under the circumstances that existed at the time, and they did not violate a clearly established right of Plaintiff during their use of force against him since they: 1) only used force after Plaintiff had refused multiple orders and had physically resisted being handcuffed; 2) attempted to use soft hand control to restrain Plaintiff so that he could be escorted out of the Pod; and 3) Defendant Miller did not deploy his chemical agent until he had witnessed Plaintiff's repeated refusal of Defendant Elola's orders and had witnessed Plaintiff's physical resistance to being handcuffed. *Id., citing* Elola Aff., ¶¶ 11, 13, 15, 16; Miller Aff., ¶¶ 17, 19, 21.

With regard to Plaintiff's official capacity claims against them, Defendants argue that those claims would be claims against Dickson County, and they note that Dickson County is not a party to this action. *Id.* Defendants further argue that Plaintiff could only establish municipal liability against Dickson County if he could demonstrate that a constitutional violation occurred because of a Dickson County policy, practice, or custom by offering evidence of one of the following: 1) the existence of an illegal official policy or legislative enactment; 2) that an official with final decision-making authority ratified illegal actions; 3) the existence of a policy of inadequate training or supervision; or 4) the existence of a custom of tolerance or acquiescence

of federal rights violations. *Id., citing Burgess v. Fisher,* 735 F.3d 462, 478 (6th Cir. 2013) (internal citations omitted).

Defendants contend that Plaintiff has failed to establish that they were improperly trained because Plaintiff has failed to specify how Defendants were inadequately trained, has failed to even reference the Jail's training policies and procedures, and has acknowledged in his deposition that he does not have information regarding the training of correctional officers at the Jail. *Id., citing* Plaintiff's Dep. Defendants argue that the Jail's policies and procedures comply with the minimum standards set forth by the Tennessee Corrections Institute ("TCI") in all manners, including relating to the training and education of its correctional officers in the appropriate use of force. *Id., citing* Felts Aff., ¶¶ 8-11, 27. Defendants additionally maintain that, at the time of the incident in question, it is undisputed that they had fulfilled all of their training and educational requirements set forth by the Jail's policies and procedures, including regarding the use of force against inmates and the proper methods of use for chemical agents. *Id., citing* Felts Aff., *passim*.

Finally, Defendants argue that although Plaintiff seemingly takes issue with the response he received to the grievance he filed, Plaintiff has no constitutional right to a specific inmate grievance procedure. *Id.* Defendants contend that it is undisputed that Plaintiff's grievance was responded to in a timely manner by Jail staff. *Id.*

As noted, Plaintiff has not responded to the instant Motion or to Defendants' Statement of Undisputed Material Facts, nor has he filed his own Statement of Undisputed Material Facts.

For the reasons discussed below, the undersigned finds that there are no genuine issues of material fact and that Defendants are entitled to a judgment as a matter of law. The undersigned

therefore recommends that Defendants' Motion for Summary Judgment (Docket No. 38) be GRANTED.

## II. Facts[3]

### A. Factual Allegations of Plaintiff's Verified Complaint

Defendant Elola "aggressively approached" him, "pointed his finger" in Plaintiff's face, yelled at him to return to his bunk or be taken to the "hole," and instructed Plaintiff to "pack your shit." Docket No. 1. Plaintiff "stood in temporary shock," and before he had time to respond to Defendant Elola's "demands," Defendant Elola again ordered Plaintiff to "pack your shit." *Id.* Plaintiff replied "But I did nothing wrong," in response to which Defendant Elola grabbed him and slammed him into the wall. *Id.* Defendants Miller and Webster then "rush[ed] in and start[ed] attacking" him, "repeatedly slamming him into the wall twisting his arms behind him, shoving his head toward the ground etc." *Id.* When Defendant Miller turned his attention toward another inmate, Plaintiff was able to "escape the grasp of the two remaining officers (Webster, Sgt. Elola)." *Id.* "Once free [Plaintiff] retreated under the stairs towards the bathroom." *Id.* Defendant Miller followed Plaintiff to the bathroom and sprayed him with pepper spray. *Id.* Defendants then left, but returned approximately fifteen minutes later to try to "talk to him in a peaceful manner." *Id.* Plaintiff "constantly" has "bad dreams about the whole situation," and suffers from "the re-injury to" his shoulder. *Id.*

### B. Affidavit of Rondia Felts

Rondia Felts has been employed by the Dickson County Sheriff's Office since March of

---

[3] Unless otherwise noted, the following facts are in a form required by Fed. R. Civ. P. 56, and are undisputed.

1995. Felts Aff., ¶ 2. From September of 2007 to February of 2016, Ms. Felts served as a Lieutenant with the Sheriff's Office and was the acting Administrator of the Dickson County Jail from October of 2014 to February of 2016. *Id.*, ¶ 5. In February of 2016, Ms. Felts was promoted to Captain and awarded the position of Dickson County Jail Administrator. *Id.*, ¶ 3. Her duties as the acting Jail Administrator were substantially similar to her current duties as the Jail Administrator. *Id.*, ¶ 5. As the Jail Administrator, Ms. Felts oversees the Jail's operations, its compliance with state standards, and its compliance with policies set forth by the Dickson County Sheriff's Office. *Id.*, ¶ 4. As the acting Jail Administrator, Ms. Felts oversaw the same. *Id.*, ¶ 5.

The Jail has always been recommended for certification by the TCI, and Dickson County Officers complete forty (40) hours of TCI training annually. *Id.*, ¶ 6; Ex. 1. The Jail's Policies and Procedures comply with, and to a certain extent exceed, the TCI's Minimum Standards for Local Correctional Facilities. *Id.*, ¶ 27. The TCI, in its Minimum Standards for Local Correctional Facilities, permits force to be used to: 1) overcome resistance; 2) repel aggression; 3) protect life; or 4) retake prisoner or property. *Id.*, ¶ 7; Ex. 1. The Jail's policy regarding use of force permits correctional officers to use only the amount of force which is reasonable and necessary to affect an arrest or assume control over any given situation. *Id.*, ¶ 8; Ex. 2. Defendants have all received written instructions dealing with the use of force and have demonstrated an understanding of said instructions. *Id.*, ¶ 9.

Defendants' training satisfied both the Jail's Policies and Procedures and the training required by the TCI. *Id.*, ¶ 25. Said training taught Defendants how to properly restrain an inmate without using excessive force and without risking serious injury to the inmate. *Id.*

Throughout the entirety of the incident at issue, Defendants complied with the Jail's Policies and Procedures relating to the use of force. *Id.*; ¶ 26.

The Jail has established a Use of Force Continuum as a general guideline for assisting its correctional officers in determining which force is reasonable and necessary for a given circumstance. *Id.*, ¶ 10. The Use of Force Continuum begins with the least severe use of force and progresses to the most severe form of force allowed. *Id.*, ¶11. The Continuum is as follows: 1) physical presence; 2) verbal warning; 3) verbal command; 4) soft hand control; 5) chemical weapon; 6) hard hand control; 7) impact weapon; and 8) deadly force. *Id.*; Ex. 2. Because the use of force is reactionary and dependent on the resistive action, however, there will be times that not all the steps in the Use of Force Continuum will be used. *Id.*, ¶ 10; Ex. 2.

The uses of force employed by Defendants during the incident in question were in accordance with the Use of Force Continuum, in that the force employed gradually escalated. *Id.*, ¶ 12. Jail Administrator Felts has reviewed the use of force reports related to the June 29, 2015 incident and believes that each act of force Defendants used was reasonable and necessary to gain control of Plaintiff, in light of the circumstances then-present. *Id.*, ¶ 13.

The TCI, in its Minimum Standards for Local Correctional Facilities, requires that all correctional officers authorized to use chemical agents shall receive basic and ongoing in-service training in the use of such chemical agents. *Id.*, ¶ 14. Before a Jail correctional officer is permitted to carry a chemical agent, the correctional officer is required to have received training on its use and a Certificate of Training must be kept in the officer's training file. *Id.*, ¶ 15; Ex. 2. Defendant Miller has received both initial training and continued training on the proper use of deploying a chemical agent and a Certificate of Training is kept in his training file. *Id.*, ¶ 16. Jail

Administrator Felts has reviewed the evidence of the incident in question and is of the opinion that Plaintiff had refused multiple orders and was actively resisting being handcuffed when Defendant Miller deployed his chemical agent. *Id.*, ¶ 17.

Following the deployment of a chemical agent, the affected inmate(s) must be given an opportunity to decontaminate. *Id.*, ¶ 18; Ex. 2.[4] Plaintiff was given an opportunity to decontaminate after being sprayed by a chemical agent. *Id.*, ¶ 20. Medical staff at the Jail also x-rayed Plaintiff's shoulder following the incident, as Plaintiff complained of shoulder pain. *Id.* Nothing was found to be wrong with Plaintiff's shoulder. *Id.*

Correctional officers at the Jail are required to file an Incident Report whenever an inmate violates an institutional rule. *Id.*, ¶ 21; Ex. 3. Defendants all filed Incident Reports shortly after the incident in question. *Id.*; ¶ 22; Ex. 4.

Pursuant to Dickson County's Policies and Procedures relating to inmate grievances, inmates are permitted to file grievances as an acceptable procedure for the settlement of legitimate complaints concerning any incident, policy, or condition existing or occurring within the Jail. *Id.*, ¶ 23. Jail staff is required to review and respond to all appropriate grievances within ten (10) days of receipt. *Id.* If the grievance is related to an inmate's health or welfare, a reply must be made as soon as possible, and within forty-eight (48) hours of the complaint. *Id.*; Ex. 5.

Plaintiff submitted a grievance on July 5, 2015, complaining of the actions taken by Defendants. *Id.*, ¶ 24. Jail Administrator Felts spoke with Plaintiff within ten (10) days of

----

[4] "Decontaminate" describes the process of treating an inmate that has been exposed to a chemical agent so as to diminish the spray's effect, as quickly as possible. *Id.*, ¶ 19.

receiving the grievance and communicated to him that the use of force by the officers was necessary and reasonable in light of the circumstances present; she reached this conclusion after reviewing the incident reports, Defendant Miller's Use of Force Report, and video footage, and after speaking with Defendants, and based upon her over twenty (20) years of experience working in corrections. *Id.*

## C. Affidavit of David Elola

Defendant Elola completed TCI's week-long Basic Training Course for jail deputies in 2011. Elola Aff., ¶ 1. Defendant Elola worked as a Corporal at the Jail from November 6, 2013 until September 18, 2014, when he was promoted to his current position of Sergeant. *Id.* He has been required to complete forty (40) hours of TCI training annually, and he completed the requisite forty (40) hours of training in 2014. *Id.*

At the time of his Affidavit, Defendant Elola worked first shift at the Jail, from 7:00 a.m. until 3:00 p.m., and he is responsible for supervising the deputies on duty during his shift, reviewing disciplinary actions taken by deputies, and maintaining the safe and orderly operation of the Jail. *Id.*, ¶¶ 2, 3.

On June 29, 2015, Defendant Elola started his shift at 7:00 a.m.. *Id.*, ¶ 4. At approximately 12:10 p.m., Defendant Miller requested his presence in Pod D20 to help resolve an issue related to an inmate's bunk assignment.[5] *Id.* Another inmate in the Pod had previously been assigned a top bunk but now needed to be re-assigned to a bottom bunk because he had begun suffering from seizures. *Id.* On June 29, 2015, there were no unoccupied bottom bunks

---

[5] Pod D20 of the Jail consists of two floors. *Id.*, ¶ 5. The first floor contains five (5) cells, as does the top floor. *Id.* Each cell on the bottom floor has a top bunk and a bottom bunk. *Id.*

available to which the inmate with a medical restriction could be re-assigned. *Id.*, ¶ 6.

Defendant Miller informed Defendant Elola that he had previously requested for an inmate to volunteer to give his bottom bunk to the inmate in need, however no one volunteered so Defendant Elola selected an inmate on the bottom floor to move bunks. *Id.*, ¶ 7. Defendant Miller then told Defendant Elola that an inmate was volunteering to give up his bunk but wanted to speak to the Sergeant. *Id.* Defendant Miller also told Defendant Elola that several of the inmates in Pod D20 became argumentative and confrontational when the officers asked for an inmate to voluntarily give up his bottom bunk. *Id.*

Upon entering Pod D20, Defendant Elola advised the inmates in the Pod that they do not control the inmate movements or bunk assignments and that if any of the inmates had a problem with the bunk re-assignment process, then they would be taken to lockdown. *Id.*, ¶ 8. Plaintiff became visibly agitated with Defendants' requests that a bunk be voluntarily provided and began shouting his displeasure. *Id.*, ¶ 10. At that time, Plaintiff was assigned to a top bunk. *Id.*, ¶ 9. He was not asked to give up his bunk, as there was no need for a top bunk. *Id.*

Defendant Elola walked toward Plaintiff and ordered him to calm down and return to his bunk. *Id.*, ¶ 11. Plaintiff continued to approach Defendant Elola and refused to follow Defendant Elola's direct order, claiming that he did nothing wrong, and demanding an explanation for why he was being ordered back to his bunk. *Id.* Defendant Elola was aware that Plaintiff's father had recently passed away and that Plaintiff had been upset by the news, thought that Plaintiff was still upset over his father's death, and believed that removing Plaintiff from the Pod would be in Plaintiff's best interest. *Id.*, ¶ 12. Defendant Elola ordered Plaintiff to pack his belongings and leave the Pod with him. *Id.* Plaintiff refused to follow Defendant Elola's order,

remained fixed to his position at the bottom of the stairs, and stated, "you're not taking me to lockdown." *Id.*, ¶ 13.

Defendant Elola again ordered Plaintiff to return to his bunk and pack his belongings. *Id.*, ¶ 14. For the third time, Plaintiff refused to follow Defendant Elola's order. *Id.* In response to his third refusal, Defendant Elola ordered Plaintiff to give him his hands and he reached for his handcuffs. *Id.*, ¶ 15. Using the least amount of force necessary, Defendant Elola attempted to place handcuffs on Plaintiff. *Id.* Defendant Miller assisted Defendant Elola with his initial attempt to handcuff Plaintiff. *Id.* Plaintiff refused and resisted Defendant Elola's attempts to apply handcuffs by attempting to pull away in a combative manner. *Id.*

Once Plaintiff began to pull away, Defendants Elola and Miller, with the assistance of Defendant Webster, began to use soft hand control against Plaintiff in an attempt to gain Plaintiff's compliance. *Id.*, ¶ 16. The soft hand control employed by Defendant Elola during this incident can best be described as grappling and/or wrestling in an attempt to bring Plaintiff to the ground. *Id.*, ¶ 17.

Defendants never attempted to strike or kick Plaintiff during the incident. *Id.*

While attempting to handcuff Plaintiff, several of the other inmates housed in Pod D20 began to angrily yell and aggressively approach Defendants in a threatening manner. *Id.*, ¶ 18. Fearing for his personal safety and the safety of others, Defendant Elola disengaged from Plaintiff and moved towards the approaching inmates, with his baton extended at his side and pointed down, demanding that the inmates stay back. *Id.* Defendant Miller also disengaged from Plaintiff and turned towards the approaching inmates, also ordering them to stay back. *Id.*

While Defendants Elola and Miller were disengaged from Plaintiff and had their attention

fixed on the approaching inmates, Plaintiff broke free from Defendant Webster's grasp.  *Id.*, ¶ 19.

Once free from Defendant Webster's grasp, Plaintiff moved a couple of steps toward the

bathroom, then turned back to face Defendants and assumed an aggressive posture and

demeanor.  *Id.*  To gain Plaintiff's compliance, Defendant Miller effectively deployed his

chemical agent spray with one burst in Plaintiff's direction.  *Id.*, ¶ 20.  Immediately upon being

sprayed, Plaintiff retreated to the Pod D20 bathroom area.  *Id.*, ¶ 21.  Defendant Elola followed

Plaintiff into the bathroom, where he observed that the chemical agent spray was affecting

Plaintiff.  *Id.*, ¶ 22.

While in the bathroom, Defendant Elola ordered Plaintiff to once again come with him.

*Id.*  Plaintiff finally complied with Defendant Elola's order to leave Pod D20 and they walked out

of the bathroom and exited the Pod without further incident or force being used.  *Id.*, ¶ 23.

Plaintiff was escorted to booking, decontaminated, and placed in holding under disciplinary

status, per Lt. Rondia Felt's orders.  *Id.*, ¶ 24.

Defendant Elola's actions, including the use of force employed to gain Plaintiff's

compliance, were consistent with training and policies, and justified by Plaintiff's actions.  *Id.*,

¶ 25.

### D.  Affidavit of Joshua Miller

At the time of his Affidavit, Defendant Miller was employed as a Correctional Corporal

at the Stewart County Jail, but, at all times relevant to the instant action, had been employed as a

Corporal the Jail.  Miller Aff., ¶¶ 1, 2.  In 2014, while employed at the Jail, Defendant Miller

completed a week-long TCI Basic Training course for jail deputies.  *Id.*  He was also required to

complete forty (40) hours of in-service training annually, both in-house at the Jail and through

the TCI. *Id.* In 2014, Defendant Miller completed the requisite forty (40) hours of training. *Id.*

On June 29, 2015, Defendant Miller worked first shift (from 7:00 a.m. until 3:00 p.m.) as a Corporal at the Jail. *Id.*, ¶¶ 2, 3. At approximately 12:00 p.m., Defendant Miller entered Pod D20 with Defendant Webster to assist with an issue related to an inmate's bunk assignment (another inmate in the Pod had previously been assigned a top bunk but now needed to be re-assigned to a bottom bunk because he had been suffering from seizures). *Id.*, ¶ 4. At that time, there were no unoccupied bottom bunks available to which the inmate with a medical restriction could be assigned. *Id.*, ¶ 6.[6]

Upon entering Pod D20, Defendants Miller and Webster requested that an inmate volunteer to give up his bottom bunk to the inmate in need. *Id.*, ¶ 7. No inmates volunteered to give up their bottom bunk and several of the inmates verbally expressed their displeasure by becoming argumentative and confrontational with the request stating that it was not fair for any of them to have to give up their bottom bunk. *Id.*, ¶ 8.

Plaintiff was assigned to a top bunk. *Id.*, ¶ 9. Plaintiff was not asked to give up his top bunk, as there was no need for a top bunk. *Id.* Nonetheless, Plaintiff was one of the objecting inmates. *Id.* Plaintiff verbally expressed his displeasure with Defendants' request while pacing around the perimeter of the Pod's common area. *Id.*, ¶ 10. Defendants Miller and Webster then briefly left the Pod. *Id.*, ¶ 11.

Defendant Miller informed Defendant Elola, his immediate supervisor, that the inmates were resisting the bunk reassignment and he requested Defendant Elola's assistance in resolving

---

[6] Pod D20 of the Jail consists of two floors. *Id.*, ¶ 5. The first floor contains five (5) cells, as does the top floor. *Id.* Each cell on the bottom floor has a top bunk and a bottom bunk. *Id.*

the issue. *Id.*, ¶ 12. At approximately 12:10 p.m., Defendants Miller and Webster re-entered Pod D20 with Defendant Elola. *Id.*, ¶ 13. Upon re-entering Pod D20, Defendant Elola selected an inmate on the first floor to move from his bottom bunk and advised the entire Pod that they do not control inmate movements or bunk assignments and that if any of the inmates had a problem with the bunk reassignment process, then those inmates would be taken to lockdown. *Id.*, ¶ 14.

Plaintiff became visibly agitated with Defendant Elola's requests that a bunk be voluntarily provided and began shouting his displeasure. *Id.*, ¶ 15. Defendant Elola then moved toward Plaintiff and ordered Plaintiff to calm down and return to his bunk. *Id.*, ¶ 16. Plaintiff, while moving toward Defendant Elola, refused to follow Defendant Elola's direct order, claiming that he had done nothing wrong, and demanding an explanation for why he was being ordered back to his bunk. *Id.*, ¶ 17. Defendant Elola responded by again ordering Plaintiff to return to his bunk, pack his belongings, and exit the Pod with him. *Id.,* ¶ 18. Again, Plaintiff refused to follow Defendant Elola's direct order and responded by stating, "you're not taking me to lockdown," and remaining fixed to his position at the bottom of the stairs. *Id.*, ¶ 19. Defendant Elola again ordered Plaintiff to return to his bunk and pack his belongings. *Id.*, ¶ 20. For the third time, Plaintiff refused to follow Defendant Elola's direct order. *Id.*

In response to this third refusal, Defendant Elola ordered Plaintiff to give him his hands. *Id.*, ¶ 21. Defendant Miller assisted Defendant Elola with attempting to handcuff Plaintiff to escort him to a different area of the Jail. *Id.*, ¶ 22. Plaintiff resisted Defendants' attempts to apply the handcuffs by attempting to pull away from them in a combative manner. *Id.*, ¶ 23.

Once Plaintiff began to pull away, Defendants Miller and Elola, with the assistance of Defendant Webster, began to use soft hand control against Plaintiff in an attempt to gain

Plaintiff's compliance. *Id.*, ¶ 24. The soft hand control employed by Defendant Miller during this incident can best be described as grappling and/or wrestling in an attempt to bring Plaintiff to the ground. *Id.*, ¶ 25.

Defendants never attempted to strike or kick Plaintiff during the incident. *Id.*

While engaged with Plaintiff, several of the other inmates housed in Pod D20 began to angrily yell and aggressively approach Defendants in a threatening manner. *Id.*, ¶ 26. Defendant Miller began alternating his attention between Plaintiff and the approaching inmates. *Id.*, ¶ 27. Defendant Miller momentarily turned his attention and head away from Plaintiff so that he could assess the threat represented by the approaching inmates and order them to move back. *Id.* Despite Defendants Miller and Elola ordering the inmates back, the inmates remained approximately eight (8) to ten (10) feet away from them as they struggled with Plaintiff. *Id.*, ¶ 28.

At that time, Defendant Elola disengaged from Plaintiff and moved toward the approaching inmates with his baton extended at his side and pointed down and requested the inmates to stay back. *Id.*, ¶ 29. Fearing for his own personal safety and the safety of Defendants Elola and Webster, Defendant Miller disengaged from Plaintiff, turned toward the inmates that were yelling and had not retreated, and again ordered the inmates to get back while un-holstering his chemical agent spray. *Id.*, ¶ 30.

While Defendants Elola and Miller were disengaged from Plaintiff and had their attention fixed on the approaching inmates, Plaintiff broke free from Defendant Webster's grasp. *Id.*, ¶ 31. Once free from Defendant Webster's grasp, Plaintiff moved a couple of steps toward the bathroom, then turned back to face Defendants and assumed an aggressive posture and

17

demeanor.  *Id.*, ¶ 32.  Wanting to restore order quickly, Defendant Miller loudly and clearly

ordered Plaintiff to get on the ground.  *Id.*, ¶ 33.  Plaintiff refused, and because of Plaintiff's

continued resistance, aggressive behavior, and failure to obey his direct order, Defendant Miller

effectively deployed one burst of his chemical agent spray in Plaintiff's direction.  *Id.*, ¶ 35.[7]

Immediately upon being sprayed, Plaintiff retreated to the Pod D20 bathroom area.  *Id.*, ¶ 36.

Defendant Elola followed Plaintiff into the bathroom, and Defendant Miller remained in the

common area of the Pod supervising the rest of the inmates.  *Id.*, ¶ 37.

　　　　After a short time, Defendant Elola and a compliant Plaintiff emerged from the bathroom.

*Id.*, ¶ 38.

　　　　Defendant Miller's actions, including the use of force employed to gain Plaintiff's

compliance, were consistent with training and policies, and justified by Plaintiff's actions.  *Id.*,

¶ 39.

**E.  Affidavit of Derrick Webster**

　　　　Defendant Webster has worked at the Jail since August 5, 2013, first as a Deputy and

later as a Corporal.  Webster Aff., ¶ 1.  In 2014, Defendant Webster completed a week-long TCI

Basic Training course for jail deputies.  *Id.*  He is also required to complete forty (40) hours of

in-service training annually, both in the Jail and through TCI.  *Id.*  In 2014, Defendant Webster

completed the requisite forty (40) hours of training.  *Id.*

　　　　On June 29, 2015, Defendant Webster worked first shift (from 7:00 a.m. until 3:00 p.m.)

as a Deputy at the Jail.  *Id.*, ¶¶ 2, 3.  At approximately 12:00 p.m., Defendant Webster entered

Pod D20 with Defendant Miller to assist with an issue related to an inmate's bunk assignment

---

[7] There is no paragraph 34 in Defendant Miller's Affidavit.

(another inmate in the Pod had previously been assigned a top bunk but now needed to be re-assigned to a bottom bunk because he had been suffering from seizures).  *Id.*, ¶ 4.  At that time, there were no unoccupied bottom bunks available to which the inmate with a medical restriction could be assigned.  *Id.*, ¶ 6.[8]

Upon entering Pod D20, Defendants Webster and Miller requested that an inmate volunteer to give up his bottom bunk to the inmate in need.  *Id.*, ¶ 7.  No inmates volunteered to give up their bottom bunk and several of the inmates verbally expressed their displeasure by becoming argumentative and confrontational with the request stating that it was not fair for any of them to have to give up their bottom bunk.  *Id.*, ¶ 8.

Plaintiff was assigned to a top bunk.  *Id.*, ¶ 9.  Plaintiff was not asked to give up his top bunk, as there was no need for a top bunk.  *Id.*  Nonetheless, Plaintiff was one of the objecting inmates.  *Id.*  Plaintiff verbally expressed his displeasure with Defendants' request while pacing around the perimeter of the Pod's common area.  *Id.*, ¶ 10.  Defendants Miller and Webster then briefly left the Pod.  *Id.*, ¶ 11.

Defendant Miller informed Defendant Elola (Defendants Miller and Webster's immediate supervisor) that the inmates were resisting the bunk reassignment and he requested Defendant Elola's assistance in resolving the issue.  *Id.*, ¶ 12.  At approximately 12:10 p.m., Defendants Webster and Miller re-entered Pod D20 with Defendant Elola.  *Id.*, ¶ 13.  Upon re-entering Pod D20, Defendant Elola selected an inmate on the first floor to move from his bottom bunk and advised the entire Pod that they do not control inmate movements or bunk assignments and that if

---

[8] Pod D20 of the Jail consists of two floors.  *Id.*, ¶ 5.  The first floor contains five (5) cells, as does the top floor.  *Id.*  Each cell on the bottom floor has a top bunk and a bottom bunk. *Id.*

any of the inmates had a problem with the bunk reassignment process, then those inmates would be taken to lockdown. *Id.*, ¶ 14.

Plaintiff became visibly agitated with Defendant Elola's requests that a bunk be voluntarily provided and began shouting his displeasure. *Id.*, ¶ 15. Defendant Elola then moved toward Plaintiff and ordered Plaintiff to calm down and return to his bunk. *Id.*, ¶ 16. Plaintiff, while moving toward Defendant Elola, refused to follow Defendant Elola's direct order, claiming that he had done nothing wrong, and demanding an explanation for why he was being ordered back to his bunk. *Id.*, ¶ 17. Defendant Elola responded by again ordering Plaintiff to return to his bunk, pack his belongings, and exit the Pod with him. *Id.,* ¶ 18. Again, Plaintiff refused to follow Defendant Elola's direct order and responded by stating, "you're not taking me to lockdown," and remaining fixed to his position at the bottom of the stairs. *Id.*, ¶ 19. Defendant Elola again ordered Plaintiff to return to his bunk and pack his belongings. *Id.*, ¶ 20. For the third time, Plaintiff refused to follow Defendant Elola's direct order. *Id.*

In response to this third refusal, Defendant Elola ordered Plaintiff to give him his hands. *Id.*, ¶ 21. Defendant Miller assisted Defendant Elola with attempting to handcuff Plaintiff to escort him to a different area of the Jail. *Id.*, ¶ 22. Plaintiff resisted Defendants' attempts to apply the handcuffs by attempting to pull away from them in a combative manner. *Id.*, ¶ 23.

Upon seeing Plaintiff physically resist Defendants Miller and Elola's attempts to apply handcuffs to him, Defendant Webster joined Defendants Miller and Elola in using soft hand control against Plaintiff in an attempt to gain Plaintiff's compliance. *Id.*, ¶ 24. The soft hand control employed by Defendant Webster during this incident can best be described as grappling and/or wrestling in an attempt to bring Plaintiff to the ground. *Id.*, ¶ 25.

Defendants never attempted to strike or kick Plaintiff during the incident. *Id.*

While engaged with Plaintiff, several of the other inmates housed in Pod D20 began to angrily yell and aggressively approach Defendants in a threatening manner. *Id.*, ¶ 26. While Defendants were engaged with Plaintiff, Defendant Webster could hear Defendants Miller and Elola repeatedly ordering the inmates to stay back. *Id.*, ¶ 27.

While Defendant Webster was on his knees struggling to handcuff Plaintiff, Defendants Miller and Elola disengaged from Plaintiff and turned toward the other inmates. *Id.*, ¶ 28. Taking advantage of Defendants Miller and Elola's diverted attention, Plaintiff was able to break away from Defendant Webster's grasp. *Id.*, ¶ 29. As Defendant Webster got to his feet, he observed Defendant Elola moving toward the approaching inmates with his baton extended at his side and pointed down, ordering the inmates to stay back. *Id.*, ¶ 30.

Defendant Webster heard Defendant Miller loudly and clearly ordering Plaintiff to get on the ground. *Id.*, ¶ 31. Defendant Webster observed that Plaintiff did not get on the ground as he was ordered, but remained facing Defendant Miller in an aggressive stance and posture. *Id.*, ¶ 32. Defendant Miller had his pepper spray displayed. *Id.* Defendant Miller then effectively deployed one burst of his chemical agent spray to Plaintiff's face. *Id.*, ¶ 33. Immediately upon being sprayed, Plaintiff retreated to the Pod D20 bathroom area. *Id.*, ¶ 34. Defendant Elola followed Plaintiff into the bathroom, and Defendant Webster remained in the common area of the Pod supervising the rest of the inmates. *Id.*, ¶ 35.

After a short time, Defendant Elola and a compliant Plaintiff emerged from the bathroom. *Id.*, ¶ 36.

Defendant Webster's actions, including the use of force employed to gain Plaintiff's

compliance, were consistent with training and policies, and justified by Plaintiff's actions. *Id.*, ¶ 37.

### F. Plaintiff's Relevant Deposition Testimony

Three days prior to the incident in question, Plaintiff's sister came to Jail visitation and informed him that his father had passed away. Plaintiff's Dep., p. 27:7-19. Plaintiff was upset over his father's death. *Id.*

Plaintiff heard Defendant Elola's orders to him, understood his orders, and chose to disobey his orders. *Id.*, p. 42:6-22; 53:2-14.

Plaintiff had previously torn ligaments in his shoulder during a dirt bike accident, which required major surgery to repair. *Id.*, p. 61:4-20. This injury and resultant surgery caused arthritis to form in Plaintiff's shoulder. *Id.*, p. 61:25-62:1. Plaintiff alleges that he re-injured his shoulder during the incident at issue, but acknowledges that this incident did not cause his arthritis. *Id.*, p. 59:1-61:20; 64:14-16. This "re-injury" is the only physical injury Plaintiff alleges he suffered as a result of Defendants' conduct. *Id.*, p. 70:7-12.[9]

Following the incident in question, the Jail medical staff x-rayed Plaintiff's shoulder. *Id.*, p. 59:6-14; 62:14-24. After reviewing the x-ray, Jail medical staff told Plaintiff that nothing was wrong with his shoulder. *Id.*, p. 59:9-10; 60:25-61:1; 62:25-63:7.

No medical officials have told Plaintiff that his shoulder was made worse by the incident at issue. *Id.,* p. 64:4-12.

--------

[9] Plaintiff acknowledges that the "bad dreams" he alleged in his Verified Complaint that he had experienced "might have been with [his] dad being passed away and everything that was going on at the time," because there is no way other than the "re-injury" of his shoulder, described herein, that the incident has affected him. *Id.*, p. 70:7-23.

# III. Analysis

## A. Local Rules 7.01(b) and 56.01(c) and (g)

Local Rule 7.01(b) states, in pertinent part:

> **b. Response.** Each party opposing a motion shall serve and file a response, memorandum, affidavits and other responsive material not later than fourteen (14) days after service of the motion, except, that in cases of a motion for summary judgment, that time shall be twenty-one (21) days after the service of the motion, unless otherwise ordered by the Court. Failure to file a timely response shall indicate that there is no opposition to the motion.

Defendants filed the instant Motion on June 17, 2016. Docket No. 38. Plaintiff has failed to respond to Defendants' Motion.

Additionally, with respect to Motions for Summary Judgment specifically, Local Rules 56.01(c) and (g) state, in pertinent part:

> **c. Response to Statement of Facts.** Any party opposing the motion for summary judgment must respond to each fact set forth by the movant by either (i) agreeing that the fact is undisputed; (ii) agreeing that the fact is undisputed for the purpose of ruling on the motion for summary judgment only; or (iii) demonstrating that the fact is disputed. Each disputed fact must be supported by a citation to the record. ...
>
> . . .
>
> **g. Failure to Respond.** Failure to respond to a moving party's statement of material facts, or a non-moving party's statement of additional facts, within the time periods provided by these Rules shall indicate that the asserted facts are not disputed for the purposes of summary judgment.

Plaintiff has failed to respond to Defendants' Statement of Undisputed Material Facts or file his own Statement of Undisputed Material Facts. Pursuant to Local Rule 56.01(g), Plaintiff's failure to respond indicates "that the asserted facts are not disputed for the purposes of summary

judgment." Accordingly, there are no genuine issues as to any material fact and all that remains
to be determined is whether Defendants are entitled to a judgment as a matter of law.

## B. Motion for Summary Judgment

It would be inappropriate to grant Defendants' Motion solely on the ground that Plaintiff
has failed to respond. *See Stough v. Mayville Community Schools*, 138 F.3d 612, 614 (6th Cir.
1998). As the Sixth Circuit has stated:

> [A] district court cannot grant summary judgment in favor of the
> movant simply because the adverse party has not responded. The
> Court is required, at a minimum, to examine the movant's Motion
> for Summary Judgment to ensure that he has discharged [his
> initial] burden ... The federal rules require that the party filing a
> Motion for Summary Judgment "always bears the burden of
> demonstrating the absence of a genuine issue as to a material fact."

*Id.* (citations omitted). The Court will, therefore, consider whether Defendants have met their
burdens under the appropriate summary judgment standards discussed below.

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate only "if the pleadings,
depositions, answers to interrogatories, and admissions on file, together with the affidavits, if
any, show that there is no genuine issue as to any material fact and that the moving party is
entitled to a judgment as a matter of law." A dispute is "genuine" only if "the evidence is such
that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty
Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).

In order to prevail on a Motion for summary judgment, the moving party must meet the
burden of proving the absence of a genuine issue as to material fact concerning an essential
element of the opposing party's claim. *Celotex v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548,
2553, 91 L. Ed. 2d 265 (1986); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir.

1989). In determining whether the moving party has met its burden, the Court must view the evidence in the light most favorable to the nonmoving party. *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986).

Fed. R. Civ. P. 56 provides that the nonmoving party may not rest upon the mere allegations or denials of his or her pleading, but his or her response, by affidavits or otherwise, must set forth specific facts showing that there is a genuine issue for trial. If a nonmoving party, however, fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, there is no genuine issue as to any material fact because a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Celotex*, 477 U.S. at 322-23, 106 S. Ct. at 2552, 91 L. Ed. 2d at 273. When this occurs, the moving party is entitled to summary judgment as a matter of law. *Id.* at 322-23, 106 S. Ct. at 2552; *Williams v. Ford Motor Co.,* 187 F.3d 533, 537-38 (6th Cir. 1999).

## C. 42 U.S.C. § 1983

### 1. Generally

Plaintiff alleges violations of his Eighth Amendment rights pursuant to 42 U.S.C. § 1983. *See* Docket No. 1. Section 1983 provides, in part, that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...

Thus, in order to state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48, 108 S. Ct. 2250, 2254-55 (1988)*, citing Parratt v. Taylor,* 451 U.S. 527, 535, 101 S. Ct. 1908, 1913, 68 L. Ed. 2d 420 (1981) (overruled in part on other grounds, *Daniels v. Williams,* 474 U.S. 327, 330-331, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986)); *Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 155, 98 S. Ct. 1729, 1733, 56 L. Ed. 2d 185 (1978). The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Id.* at 49, 108 S. Ct. 2255*, quoting United States v. Classic,* 313 U.S. 299, 326, 61 S. Ct. 1031, 1043, 85 L. Ed. 1368 (1941).

### 2. Eighth Amendment

The Eighth Amendment provides that:

> Excessive bail shall not be required, nor excessive fines imposed,
> nor cruel and unusual punishments inflicted.

U.S. Const. amend. VIII.

The United States Supreme Court has held that the constitutional prohibition of "cruel and unusual punishments" forbids punishments that are incompatible with "the evolving standards of decency that mark the progress of a maturing society," or which "involve the unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 102-03, 97 S. Ct. 285, 290, 50 L. Ed. 2d 251 (1976) (citations omitted).

In order to establish an Eighth Amendment claim, an inmate must satisfy a two-prong

test: (1) the deprivation alleged must be objectively serious; and (2) the official responsible for the deprivation must have exhibited deliberate indifference to the inmate's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S. Ct. 1970, 1977, 128 L. Ed. 2d 811 (1994).

## D.  The Case at Bar

### 1.  Official Capacity Claims

As discussed above, Plaintiff sues Defendants in their official capacities.  *See* Docket No. 1.  In complaints alleging federal civil rights violations under § 1983, "[a]n official capacity claim filed against a public employee is equivalent to a lawsuit directed against the public entity which that agent represents."  *Claybrook v. Birchwell*, 199 F.3d 350, 355 n.4 (6th Cir. 2000), *citing Kentucky v. Graham*, 473 U.S. 159, 165, 105 S. Ct. 3099, 3105, 87 L. Ed. 2d 114 (1985). *See also, Frost v. Hawkins County Bd. of Educ.*, 851 F.2d 822, 827 (6th Cir. 1988).  As such, when a public employee is sued in his or her official capacity, the claims are essentially made against the public entity.  *Id*.

At all times relevant to the instant action, Defendants were employed at the Dickson County Jail.  *See, e.g.,* Elola Aff., ¶ 1, Miller Aff., ¶ 1; Webster Aff., ¶ 1.  Therefore, they stand in the shoes of Dickson County.  *See Claybrook, supra*; *Frost, supra.*  Plaintiff has not sued Dickson County, and Dickson County is not a party to the instant action.  Accordingly, Plaintiff cannot sustain his official capacity claims.

Moreover, even if Plaintiff would have sued Dickson County, § 1983 does not permit the imposition of liability based upon *respondeat superior*.  *Polk County v. Dodson*, 454 U.S. 312, 325 (1981).  In order for Dickson County to have been held liable, Plaintiff would have had to plead allegations, *inter alia*, that an "official policy or custom was adopted by the official makers

of policy with 'deliberate indifference' towards the constitutional rights of persons affected by the policy or custom." *City of Canton v. Harris*, 489 U.S. 378, 387-88 (1989). *See also, Monell v. Dept. of Soc. Serv.*, 436 U.S. 658, 690-91 (1978) (In order to find a governmental entity liable, a plaintiff must establish that: 1) he / she suffered a deprivation of a constitutionally protected interest; and 2) the deprivation was caused by an official policy, custom, or usage of the local governmental entity.).

As noted, Plaintiff has not sued Dickson County, nor has Plaintiff alleged the existence of any deficient Dickson County policy, practice, or custom, much less alleged that an official Dickson County policy, practice, or custom caused him constitutional injury. To the extent that Plaintiff asserts a failure to train claim, it is undisputed that: 1) Defendants have completed their requisite annual training, which included, *inter alia*, how to properly restrain an inmate without using excessive force and without risking serious injury to the inmate; 2) Defendants' training satisfied both the Jail's Policies and Procedures and the TCI requirements; and 3) Defendant Miller received both initial training and continued training on the proper use of deploying a chemical agent and a Certificate of Training is kept in his training file. *See* Felts Aff., ¶¶ 9, 16, 25; Elola Aff., ¶ 1; Miller Aff., ¶ 1; Webster Aff., ¶ 1. It is further undisputed that, throughout the incident at issue, Defendants complied with the Jail's Policies and Procedures relating to the use of force. *See* Felts Aff., ¶ 26; Elola Aff., ¶ 25; Miller Aff., ¶ 39; Webster Aff., ¶ 37. Finally, it is undisputed that each act of force used by Defendants was in accordance with the Jail's Use of Force Continuum, and was reasonable and necessary to gain control of Plaintiff, in light of the circumstances then-present. *See* Felts Aff., ¶¶ 12, 13; *See also,* Elola Aff., ¶ 25; Miller Aff., ¶ 39; Webster Aff., ¶ 37. For the each of the foregoing reasons, Plaintiff cannot sustain his

official capacity claims against Defendants, and those claims should be dismissed.

### 2. Individual Capacity Claims and Qualified Immunity

Although Plaintiff's Verified Complaint originally sued Defendants only in their official capacities, this Court, when conducting its initial frivolity review, found that the allegations in Plaintiff's Verified Complaint stated a claim against Defendants in their individual capacities as well. *See* Docket No. 3. The undersigned will, therefore, analyze whether Plaintiff can sustain individual capacity claims against Defendants.

In order to defeat Defendants' properly supported Motion for Summary Judgment, Plaintiff must present affirmative evidence that each Defendant personally violated his rights; conclusory allegations are not enough. *See Street,* 886 F.2d at 1479. *See also, Anderson,* 477 U.S. at 257; *Nix v. O'Malley,* 160 F.3d 343, 347 (6th Cir. 1998); *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 888, 110 S. Ct. 3177, 3188, 111 L. Ed. 2d 695 (1990); *McDonald v. Union Camp Corp.,* 898 F.2d 1155, 1162 (6th Cir. 1990). Plaintiff must demonstrate that each Defendant either directly participated in the activity, or personally authorized, approved, or acquiesced in the activity that allegedly violated his rights. *Hays v. Jefferson County*, 668 F.2d 869 (6th Cir. 1980).

Plaintiff alleges in his Verified Complaint that Defendant Elola "aggressively approached" him, "pointed his finger" in Plaintiff's face, yelled at him to return to his bunk or be taken to the "hole," repeatedly instructed Plaintiff to "pack [his] shit," grabbed him and slammed him into the wall. Docket No. 1. Plaintiff also alleges in his Verified Complaint that Defendants Miller and Webster then "rush[ed] in and start[ed] attacking" him, "repeatedly slamming him into the wall twisting his arms behind him, shoving his head toward the ground etc." *Id.*

Plaintiff additionally avers in his Verified Complaint that Defendant Miller followed him to the bathroom and sprayed him with pepper spray. *Id.* As can be seen, Plaintiff has alleged that each Defendant has directly participated in the incident giving rise to this action. Alleging that each Defendant directly participated in the incident, however, is alone insufficient to impose liability; the conduct complained of must have violated Plaintiff's constitutional rights. *See, Hays, supra.*

Turning now to whether Defendants' conduct violated Plaintiff's constitutional rights, Defendants do not dispute that they utilized force upon Plaintiff; rather, they argue that their use of force was proper and justified in light of the circumstances then-present, such that they are entitled to qualified immunity. Docket No. 39. Qualified immunity is "an *immunity from suit* rather than a mere defense to liability." *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001). Qualified immunity generally shields government officials performing discretionary functions from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1983). The right at issue "must have been articulated with a significant degree of particularity," so that it is sufficiently clear to a reasonable official that his or her conduct would violate the right at issue. *Eugene D. v. Karman*, 889 F.2d 701, 706 (6th Cir. 1989). Qualified immunity is available as long as the official's actions "could reasonably have been thought consistent with the rights [he or she is] alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S. Ct. 3034, 3038, 97 L. Ed. 2d 523 (1987).

The initial inquiry and threshold question, according to the Supreme Court, is: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's

conduct violated a constitutional right?" *Id.*, *citing Siegert v. Gilley,* 500 U.S. 226, 232, 111 S. Ct. 1789, 1973, 114 L. Ed. 2d 277 (1991). If no constitutional right was violated, there is no necessity for further inquiry. *Id.*

A critical question is whether "any official in the defendants' position would understand that what he did violated those rights." *O'Brien v. City of Grand Rapids*, 23 F. 3d 990, 999 (6th Cir. 1994). Qualified immunity, therefore, "does not turn on the subjective good faith of the official; rather, it turns on the 'objective legal reasonableness' of his actions, assessed in light of the legal rules that were 'clearly established' at the time the actions were taken." *Id., quoting Harlow*, 457 U.S. at 818-19. "If officers of reasonable competence could disagree on whether the conduct violated the plaintiff's rights," qualified immunity will apply. *Id.*, *quoting Grossman v. Allen*, 950 F. 2d 338, 341 (6th Cir. 1991)(citations omitted).

As a preliminary matter, Plaintiff does not have a constitutional right to be spoken to in a way that is free of abrasive tone, harsh language, or hand gestures. *See Johnson*, 357 F.3d 545-46. Accordingly, even if Defendant Elola "aggressively approached" Plaintiff, "pointed his finger" in Plaintiff's face, yelled at Plaintiff to return to his bunk or be taken to the "hole," and repeatedly instructed Plaintiff to "pack [his] shit," these actions simply do not constitute a violation of Plaintiff's constitutionally protected rights.

Moreover, it is undisputed that Plaintiff heard and understood Defendant Elola's orders to him, but repeatedly refused to comply with those orders, resisted being handcuffed, broke free from Defendant Webster, ran toward the bathroom area, and assumed an aggressive posture and demeanor towards Defendants. Plaintiff's Dep. 42:6-22; 53:2-14; Elola Aff., ¶¶ 15, 16, 19; Miller Aff., ¶¶ 17, 19, 20, 23, 31, 32, 33, 35, 36; Webster Aff., ¶¶ 17, 19, 20, 23, 29, 32, 34. It is

further undisputed that the Jail has a legitimate interest in maintaining order and safety, and that, under the TCI's Minimum Standards for Local Correctional Facilities ("Standards"), force can be used to overcome resistance, repel aggression, protect life, or retake a prisoner or property, and that Jail's Use of Force Continuum complies with those Standards. Felts Aff., ¶¶ 7, 10, 27; Ex. 1. It is additionally undisputed that each act of force employed by Defendants during the incident in question was consistent with training and policies, was in accordance with the Jail's Use of Force Continuum, was reasonable, was necessary to gain control of Plaintiff in light of the circumstances then-present, and was justified. *Id.*, ¶¶ 12, 13; Elola Aff., ¶ 25; Miller Aff., ¶ 39; Webster Aff., ¶ 37.

In light of the foregoing, Defendants' use of force was reasonable under the circumstances that existed at the time, and Defendants did not violate a clearly established constitutional right of Plaintiff. Accordingly, Plaintiff cannot sustain his individual capacity claims against them, and their Motion for Summary Judgment should be granted.

## IV.  Conclusion

For the foregoing reasons, the undersigned finds that there are no genuine issues of material fact and that Defendants are entitled to a judgment as a matter of law. The undersigned therefore recommends that Defendants' Motion for Summary Judgment (Docket No. 38) be GRANTED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days after service of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court. Any party opposing said objections shall have fourteen (14) days after service of any objections filed to this Report in which to file any

response to said objections.  Failure to file specific objections within fourteen (14) days of service of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied*, 474 U.S. 1111 (1986); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.


JEFFERY S. FRENSLEY
United States Magistrate Judge